*Decisions will be entered under Rule 50.*

SETH E. KEENER, JR., AND JEANNE M. KEENER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1755–71. Filed November 22, 1972.

*E. Jackson Boggs* and *Edwin A. Pennell*, for the petitioners.
*Robert J. Shilliday, Jr.*, for the respondent.

WITHEY, *Judge:* Respondent determined a deficiency in petitioners' income tax for the taxable year 1967 in the amount of $3,050.46.

The issues presented for our consideration are:

(1) Whether payments made by petitioner's employer to petitioners during the taxable year 1967 represent a reimbursement for a loss sustained on the sale of petitioners' residence and, therefore, income to them under section 61(a), I.R.C. 1954, and

(2) Whether selling expenses and real estate expenses paid for by petitioner's employer during 1967 are income to petitioners under section 61(a), *supra*.

#### FINDINGS OF FACT

Some of the facts have been stipulated and are so found and incorporated herein by this reference.

Petitioners Seth E. and Jeanne M. Keener were residents of Tampa,

Fla., at the time the petition herein was filed. During 1965, 1966, and a portion of 1967, they owned a home in Harrisburg, Pa., sometimes hereinafter called the Harrisburg property.

Petitioners filed a joint return for the taxable year 1967 with the district director of internal revenue at Philadelphia, Pa.

Seth E. Keener, hereinafter referred to as petitioner or Keener, was employed in Harrisburg, Pa., by the Insurance Company of North America (INA) during 1965 and a portion of 1966.

In September 1965, INA decided to transfer Keener from Harrisburg to Philadelphia, Pa., in order to promote Keener to the position of regional supervisor.

Petitioners immediately began looking for a house in the Philadelphia area and entered into a contract to purchase a home located on Pepper Road, Huntington Valley, Pa. (Pepper Road home), in November 1965.

In December 1965, INA engaged two appraisers to value the Keener property. The appraisal reports forwarded to INA valued the property at $36,000 and $32,000.

On January 4, 1966, the H.O. Real Estate Department of INA gave Keener a memorandum which informed him that he was eligible to participate in the INA Appraisal Plan (hereinafter sometimes called the plan); and that his house in Harrisburg, Pa., had been appraised and a value of $34,300 had been "established by the Company." The memorandum reads, in part, as follows:

If it is your desire to participate in the Company's Appraisal Plan, please sign and have properly notarized the enclosed acceptance agreement and return it to the H.O. Real Estate Department, attention of Donald H. Sullivan on or before Jan. 18, 1966.

Copies of the existing deed must be attached to the signed acceptance agreement.

All property insurance policies or certificates must be endorsed to include the Insurance Company of North America as a "second interest loss payee" and should also be attached to the acceptance agreement. Any applicable forms and endorsements to the insurance policies must be included. If after review of your insurance coverage the Company deems it advisable that additional insurance be placed upon your property you will agree to do so, with the understanding that such additional insurance premium expense will be paid for by the Company.

Under the Appraisal Plan your residence is to be listed with the appropriate Realty or Real Estate Broker, at the sale price of $36,200.00. In cases where an exclusive listing is requested, the contract should be limited to a 90 day period and forwarded to the H.O. Real Estate Department. This is to be done promptly upon acceptance of the Appraisal Plan, in accordance with paragraph IV of the Employee Transfer Plan—Real Estate.

(S) DONALD H. SULLIVAN
H.O. REAL ESTATE DEPARTMENT

The plan is part of the INA Employee Transfer Plan which is a program of various rules and regulations governing the transfer of so-called judgment-level INA employees.

On January 8, 1966, petitioners executed the plan which reads as follows:

INSURANCE COMPANY OF NORTH AMERICA
APPRAISAL PLAN

I hereby place my premises located at 4319 Orchard Hill Road, Harrisburg, Pa., under the Insurance Company of North America Appraisal Plan, in accordance with the following conditions:

1. The valuation figure of $34,300.00 is accepted.

2. I agree to place the house for sale at a price to be determined by the Company with a Realtor or Real Estate Broker that is active in my area.

Note: In selecting a Real Estate Agent consideration should be given to the reputation, sales volume, type of property handled and sales force of the firm. Inquiry should also be made concerning local multiple listing services and the Real Estate Agent should be instructed to use this service whenever possible.

3. I will promptly advise the Real Estate Department of the Company in writing of every bona fide offer and will accept any offer deemed advisable by the Company.

4. The premises will not be sold without the prior consent of the Company.

5. Upon the sale of the premises, if the net sales price is less than the appraised value, the Company will pay the difference to me. Net sales price means the gross sales price less the following items:

    a. Brokers Commission.

    b. Revenue Stamps.

    c. Cost of preparation of deed.

    d. Penalty charges for mortgage prepayment which I can not avoid, but no more than $1\frac{1}{2}\%$.

    e. Real Estate Transfer Taxes but not greater than 1% of the sale price.

    f. Any additional settlement costs specifically approved by the Company as for example, rental of settlement rooms, attorney's fee if specifically authorized by the Company and items of a like nature, including mortgage points which I can not avoid, but not to exceed 2% of the mortgage.

6. If the net sales price is in excess of the appraised value, such increment shall be the property of the Company.

7. I will notify the H.O. Real Estate Department prior to vacating the premises.

8. I will be responsible for the necessary maintenance of the property (including taxes, insurance, mortgage payments, repairs, etc.) until title is taken by the Company. However, if I purchase a residence or rent a property at the new location, the Company will then pay the following charges on the unsold property:

    a. Real Estate taxes thereafter becoming due.

    b. Insurance premiums thereafter becoming due.

    c. Mortgage payments thereafter becoming due, however, the principal portion of such mortgage payments shall, upon the sale of the property, be deducted from the amount due to me.

    d. Reasonable normal maintenance as approved by the Company.

*      *      *      *      *      *      *

10. If the property has not been sold 90 days from the date of this contract, or if I have already moved to my new location, the Company shall have the option to take title to the unsold premises at the appraised value and I will then give a good and marketable title, or the Company may direct the disposition of the property in any manner deemed advisable, subject however, to its obligation to me as set forth in paragraph 5 above.

11. If the Company acquires title and the premises are later sold at a price in excess of the appraised figure, such increment is the property of the Company.

12. If my employment is terminated after I have joined the Appraisal Plan and before the sale of my property, or title is taken by the Company, the contract may be cancelled at the discretion of the Company. If the contract is terminated, it is agreed that I must reimburse the Company for all expenses incurred under the Appraisal Plan.

13. The contract hereby established will be governed by the law of Pennsylvania.

(S) SETH E. KEENER, JR. (Seal)
*Employee*

Accepted, Agreed and Approved:

(S) JEANNE M. KEENER (Seal)
*Employee's spouse*

Pursuant to INA's Employee Transfer Plan, any so-called judgment-level employee who agreed to participate in the plan could receive a loan from INA of up to 90 percent of the value INA placed on the employee's home. The purpose of this loan was to allow the employee to have funds available to purchase a home at the employee's new assignment. This loan could be granted to the employee at any time upon his request. Keener exercised his option to request a loan in February 1966, and in due course he received $30,870 from INA.

Keener used the $30,870 loan to purchase the Pepper Road home on March 1, 1966. The purchase price of the home was $36,000. Petitioners moved from the Harrisburg property to the Pepper Road home in March 1966.

When petitioners moved to Keener's new assignment, the Harrisburg property was not sold. The sale of the property proved difficult at the original asking price of $36,200. Several different Harrisburg realtors were employed to sell the property at various times during 1966 and 1967 and the asking price for the property was reduced many times during this period.

Donald H. Sullivan, supervisor of the INA Real Estate Department, acted as Keener's agent in the supervision of efforts to sell the property.

Since the INA Real Estate Department was handling the sale of the property for Keener, Keener did not overly concern himself with the problems of sale but on at least one occasion he did return to Harrisburg, and while there, he inspected the exterior of the property. Keener did not care when the property was sold because INA had agreed to pay him any loss that was incurred on its sale.

The property was finally sold on June 23, 1967, for $26,000 and petitioners on that date executed a deed to the new owners. Since petitioners were record titleholders of the Harrisburg property to the date of the transfer of title, INA did not elect to exercise its option to take title to the property and was not a record titleholder of the property in question at any time.

The closing arrangements on the sale of the property were held in Harrisburg on June 23, 1967. Petitioners attended the closing as owners thereof and a realtor attended representing INA.

Pursuant to the terms of the plan, the net sales price of the property was $24,135.40. The difference between the net sales price and the $34,300 appraised value is $10,164.60. If the petitioners received the gross sales price, $10,164.60 was the amount reimbursable to the petitioners under the plan.

INA records indicate that petitioners paid real estate taxes and insurance premiums owed on the Harrisburg property from February 15, 1967, to June 23, 1967. The amounts of the payments were $183.33 for real estate taxes and $20.07 for insurance premiums. Petitioners paid those amounts because the payments represented petitioners' prorated share of taxes and insurance premiums on the property for the year 1967. Petitioners were required to make these payments at the closing of the sale of the property on June 23, 1967. On their 1967 income tax return, petitioners claimed the payment of $183.33 as a deduction for real estate taxes paid.

In a final accounting memorandum sent to Keener on July 11, 1967, INA informed petitioner that the amount reimbursable to him under the plan was, after local taxes, $10,078.61. But since Keener had already secured a loan of $30,870, there would be no reimbursement. Keener was informed that after adding interest to the loan and deducting the $10,078.61, he owed INA $21,762.08.

Because of the way in which the proceeds on the sale of the property were handled, petitioners did not pay INA $21,762.08. INA received $22,570 of the gross sales price and petitioners received the remaining $3,430 from the title company handling the sale thereof.

According to the plan, petitioners should have received $36,164.60 but they actually gained a total of only $34,300 because they did not pay the selling expenses incurred on the sale of the property. The selling expenses were paid by INA for petitioners' benefit.

The petitioners' liability for the $970.69, which represented the accrued interest on the INA loan to Keener, and INA's liability for real estate expenses paid for by petitioners in the amount of $203.40, was worked out between INA and the petitioners at a later time.

INA also informed petitioners in the final accounting memorandum dated July 11, 1967, that Keener's taxable income for Federal income

tax purposes was being increased by $12,741.25 because of payments made by INA to petitioners as called for under the plan. This increase was computed as follows:

| Amount | Type of expense |
|---|---|
| $203.40 | Taxes and insurance |
| 8,300.00 | Loss on sale of property |
| 1,864.60 | Selling expenses |
| 271.11 | Real estate expenses |
| 2,102.14 | Withholding for Federal income tax |
| 12,741.25 | |

INA included $12,741.25 as taxable income in the 1967 wage statement (W–2) of petitioner which related to the sale of the Harrisburg residence.

Petitioners' accountant entered a deduction in the amount of $12,741.25 on petitioners' 1967 income tax return under miscellaneous income. An explanation attached to the return reads as follows:

Mr. Keener was transferred from Harrisburg, Pennsylvania, to Philadelphia, Pennsylvania, in 1966 by his employer. Mr. Keener sold the house to his employer for $34,300.00—the money was applied on the purchase of a new house costing $36,000.00—the employer sold the house it purchased from Mr. Keener at a loss of $12,741.25 and added this amount to his W–2 for 1967. Therefore we are deducting this amount from Mr. Keener's income.

### ULTIMATE FINDINGS

The $8,300 payment by INA to petitioners represents a reimbursement of the loss sustained on the sale of the Harrisburg property and is compensation includable in petitioners' gross income in 1967.

Payments for taxes and insurance, selling expenses, and certain real estate expenses paid by INA constitute payments of petitioners' personal expenses and are includable in petitioners' gross income in 1967.

### OPINION

Respondent determined that the payments made by petitioner's employer, INA, to petitioners represent a reimbursement for a loss sustained on the sale of petitioners' residence and are therefore income to petitioners under section 61(a) of the 1954 Code. Petitioner, in opposition, contends that the $10,639.11 in controversy [1] should not have

---

[1] Respondent determined an additional inclusion of $12,741.25 in petitioners' gross income for the taxable year 1967 with respect to the sale of their personal residence. The amount of $12,741.25 is comprised of four items: $8,300 represents petitioners' reimbursement from INA of the loss suffered by petitioners upon the sale of their Harrisburg home; $2,068 is a reimbursement of certain home "selling expenses"; $271.11 represents "real estate expenses" paid for by petitioner's employer for the benefit of petitioner; and $2,102.14 represents withholding for Federal income tax credited to petitioner's account by his employer. At the trial, petitioner conceded that the last item was properly included as income, which leaves $10,639.11 in controversy herein.

been included in his gross income for 1967 because he sold the residence directly to INA on January 8, 1966, for the amount of $34,300. It is petitioners' position that the agreement entered into by Keener and INA on January 8, 1966, constituted an absolute sale of the Harrisburg residence to INA because under the terms of the agreement, all of the benefits and burdens of ownership of the property passed from them to INA and petitioners retained only bare legal title, which the parties intended. Petitioners further contend that they did not realize a loss on this sale because they immediately invested the proceeds in another residence purchased by them 2 months prior to the sale of the Harrisburg residence in question; and therefore, they were entitled to nonrecognition of any gain or loss realized by them on the sale thereof under section 1034(a) of the 1954 Code.[2] We disagree with petitioners.

Section 61(a) provides that gross income means all income from whatever source derived, including but not limited to compensation for services and similar items. The courts have held that when an employer reimburses an employee for a loss sustained on the sale of the employee's residence upon the employee being transferred, the reimbursement is compensation for services and, therefore, income under section 61(a), *William A. Lull*, 51 T.C. 841 (1969), affd. 434 F.2d 615 (C.A. 9, 1970); *Loflin, Jr.* v. *United States*, an unreported case (W.D. Tenn. 1967); *Bradley* v. *Commissioner*, 324 F.2d 610 (C.A. 4, 1963), affirming 39 T.C. 652 (1963). In these cases, under the terms of an agreement between the employer and employee, it is contemplated that the employee will sell his personal residence in connection with a move to a new location for the convenience of the employer. The agreement usually provides that the employer will reimburse the employee for any loss he sustains after the sale of his house and/or for certain expenses incurred by the employee in connection with such sale. In essence, the employer provides indemnity against loss to the employee and the employee retains the benefits and burdens of continued ownership of the residence after entry into the agreement with the employer. *Ernest A. Pederson, Jr.*, 46 T.C. 155 (1966); *Harvey* v. *Commissioner*, an unreported case (C.A. 6, 1968), affirm-

---

[2] SEC. 1034. SALE OR EXCHANGE OF RESIDENCE.

(a) NONRECOGNITION OF GAIN.—If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

ing a Memorandum Opinion of this Court; *Jesse S. Rinehart*, 18 T.C. 672 (1952); *Ritter* v. *United States*, 393 F.2d 823 (Ct. Cl. 1968), certiorari denied 393 U.S. 844 (1968).

The Insurance Company of North America (INA), in its nationwide business activities, finds it advantageous to transfer some of its employees from one city to another for its convenience. Apparently, this occurs so often that the corporation has developed the Employee Transfer Plan which provides, *inter alia*, for payments to these employees to ease the economic burdens of moving, to reduce their concern over possible loss on the sale of their old home, and to assist them in acquiring a new one. Keener participated in the plan and executed the INA Appraisal Plan Agreement on January 8, 1966, in which petitioners agreed to accept the INA appraisal of $34,300 on the Keener property, hire a realtor, advise INA of all offers of purchase, and accept any offer that INA deemed acceptable. INA promised to reimburse petitioners for any loss they sustained on the sale of the property below the appraised value, but if the sales price was above the appraised value, INA would keep the excess. It was also agreed that until petitioners moved away from the Harrisburg property, the petitioners would be responsible for all costs of home ownership. When the transfer became effective, INA would assume the payments of all reasonable taxes, insurance, and maintenance costs and petitioners would secure endorsements on their property insurance policies naming INA as second-interest loss payee. If Keener left INA's employ prior to the sale of the Harrisburg property, the plan was to be terminated and Keener would be responsible to reimburse INA for all expenses the company had incurred pursuant to the plan.

Also, the plan makes allowances for the possibility that the employee's residence will not be sold (at the time it is necessary to purchase another house at the new assignment situs) by permitting employees to borrow up to 90 percent of the appraised value placed on the employee's home to make funds available for the purchase of a new residence. Pursuant to this provision, Keener received a "loan" from INA of $30,870. The Harrisburg property was sold on June 23, 1967, for $26,000; and as legal owners of this property, petitioners executed a deed to third-party buyers at the closing held in Harrisburg on June 23, 1967. Petitioners received $8,300 above the $26,000 sales price of the Keener property as a reimbursement from INA for the loss incurred.

In our opinion, the purpose of the payment in dispute was to induce Keener to move to Philadelphia and to insure that he would provide

high-quality services to INA in his new assignment by removing his anxiety over the sale of his Harrisburg residence. Such a reimbursement is compensatory in nature within section 61(a) as a benefit that Keener derived under his employment contract. Since the $8,300 is additional income, it is clear that this amount cannot be deducted from petitioners' income because a deduction of a loss sustained on the sale of a personal residence is specifically proscribed by section 1.165-9(a), Income Tax Regs.

The INA Appraisal Plan was not an instrument in the nature of a contract of sale as petitioners suggest. The plan was executed by petitioners on January 8, 1966, to signify their agreement with the terms of the plan dealing with the sale of their residence in the open market. INA was acting only as petitioner's agent and employer in dealing with the property in question. We do not believe that petitioners and INA intended for all the substantial benefits and burdens of ownership to pass from petitioners to INA on January 8, 1966, as petitioners urge. Petitioners legally retained the burden of paying all maintenance expenses except those expenses approved by INA, the responsibility of selling the house themselves, the responsibility of paying the realtor's commission and closing costs, the duty to pay taxes and insurance until they moved, the responsibility for maintaining insurance on the house, and the material benefit of being able to terminate the arrangement by Keener resigning his position with INA. There was no sale to INA as that term is ordinarily used. *Commissioner* v. *Brown*, 380 U.S. 563, 571 (1965).

We find no merit in petitioner's contention that INA purchased the property in question in January as an "investor" and immediately thereafter attempted to make a profit thereon by listing it at $36,200. Although INA selected the realtors and supervised their activities with respect to the sale of the property, we are convinced that the employer was acting only as petitioners' agent in an attempt to free petitioner's mind from the problems incident to the sale of his old home. Since the plan placed the prime responsibility of sale upon the petitioners, the Keeners would have been within their rights to insist on carrying out the details of the sale themselves. INA placed the $36,200 asking price on the house initially to cover the expenses they expected to incur for broker's commissions and closing costs, and to defray the administrative expenses involved in operating the overall plan. Moreover, INA was not entitled to the benefit of any profit nor did it risk any loss under certain circumstances. Paragraph 12 of the plan provides that if Keener left the employ of INA before the house was sold, the plan was to be terminated and Keener would bear the risk of loss or the benefit of any profit to be gained in a subsequent

sale. If the plan was terminated, Keener would be responsible for reimbursing INA for any expenses incurred thereunder.

The record is clear that it was Keener who ultimately sold the property on June 23, 1967. The final accounting statement dated July 11, 1967, issued by the employer to Keener shows that petitioners were the legal owners of the property in June 1967 and that the advance of $30,870 was a "company loan" and not an advance on the proceeds of a sale in 1966. Viewing the evidence in its entirety, we believe that the amount of $8,300 paid to Keener in 1967 was not part of the amount realized upon the sale in that year. No property interest passed to INA. The $8,300 was not paid by the purchaser. The $8,300 payment was made pursuant to the plan, and was made to secure better services from Keener by relieving him of worry over the sale. Payments to secure better services represent compensation. *Commissioner* v. *LoBue*, 351 U.S. 243, 247 (1956); *William A. Lull, supra* at 849; *Ritter* v. *United States, supra* at 831.

Petitioner's contention that the $8,300 in dispute is not taxable because of the application of section 1034, *supra*, providing for nonrecognition of gain on the sale of a taxpayer's residence under certain circumstances, depends upon whether the $8,300 payment under the INA Appraisal Plan was part of the amount realized upon the sale, thereby being a part of the gain subject to nonrecognition under that section. Since we have concluded hereinabove that this payment was not a part of the amount realized upon the sale on June 23, 1967, the petitioners' contention must be rejected. *William A. Lull, supra* at 849.

Respondent determined that selling expenses of $2,068 and real estate expenses of $271.11 (two items included in the additional inclusion of the total amount of $12,741.25 in petitioners' gross income) paid for by INA are income to petitioners for the taxable year 1967 under section 61(a), *supra*. There is no dispute that INA made these expenditures. Our conclusion that petitioners were the owners of the Harrisburg property from January 1, 1967, to June 23, 1967, when they transferred the deed to third parties is dispositive of the issue and therefore the payments in question must be considered additional income. The selling expenses and real estate expenses were made for petitioners' benefit and are taxable to them under section 61(a) as compensation for services. The proposition that indirect moving expenses paid for by the taxpayer's employer are income to the taxpayer is well settled. *Willis B. Ferebee*, 39 T.C. 801 (1963); *Ernest A. Pederson, Jr., supra; William A. Lull, supra; Norvel Jeff McLellan,* 51 T.C. 462 (1968).

*Decision will be entered under Rule 50.*